Filed 10/7/15  P. v. Molina CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# **COPY**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C071453 |
| Plaintiff and Respondent, | (Super. Ct. No. LF011371A) |
| v. | |
| ROBERTO EMMANUEL MOLINA, | |
| Defendant and Appellant. | |

A jury convicted defendant Roberto Emmanuel Molina of the following charges: attempted murder of a peace officer (Pen. Code, §§ 664/187, subd. (e) [count 1]; unless otherwise stated, statutory section references that follow are to the Penal Code), unlawful driving or taking of a motor vehicle (Veh. Code, § 10851, subd. (a) [count 3]), possession of a controlled substance with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a) [count 5]), possession of a firearm by a felon (former § 12021, subd. (a)),

renumbered section 29800, subdivision (a) without substantive change; (see Stats. 2010, ch. 711, § 6.) [count 7]), possession of a firearm by an active participant in a criminal street gang (§ 12025, subd. (b)(3)), renumbered section 25400, subdivision (c) without substantive change; (see Stats. 2010, ch. 711, § 6.) [count 9]), active participation in a criminal street gang (§ 186.22, subd. (a) [count 10]), and hit-and-run driving causing property damage (Veh. Code, § 20002, subd. (a) [count 11]). As to count 1, the jury found true an allegation that defendant personally used a firearm pursuant to section 12022.53, subdivision (b) and that the personal firearm use was for the benefit of a street gang under section 12022.53, subdivision (e)(1), but found not true the criminal street gang enhancement under section 186.22, subdivision (b). The court later struck the jury's true finding under section 12022.53, subdivision (e)(1) as inconsistent with its finding on the gang enhancement under section 186.22, subdivision (b).

The trial court sentenced defendant to an aggregate prison sentence of life with the possibility of parole plus 10 years, eight months.

On appeal, defendant identifies numerous purported errors, including the following: (1) the trial court failed to bifurcate the substantive gang charges and the gang enhancements from the remaining charges; (2) that because he acted alone, insufficient evidence supports the criminal street gang convictions for counts 9 and 10; (3) the court erred in instructing the jury on the substantive gang charge under section 186.22, subdivision (a); (4) the court violated his right to due process by admitting certain tattoo evidence and gang expert testimony on the tattoos' significance; (5) the court violated his right to confront the witnesses against him by permitting the gang experts to testify to out-of-court statements that served as the basis for their opinions; (6) insufficient evidence supports the gang charges; (7) the court violated defendant's due process rights by admitting expert testimony based on allegedly unreliable material; (8) the court violated his right against self-incrimination by admitting his responses to jail classification questions; (9) the court violated his right to due process of law by admitting

2

evidence of a prior stolen vehicle incident; (10) the trial court abused its discretion in denying his *Pitchess* motion to review the arresting officer's personnel file; and (11) that, cumulatively, the trial errors deprived him of his constitutional right to a fair trial.

We reverse defendant's conviction for possession of a firearm by a gang member (former § 12025, subd. (b)(3) [count 9]), and his conviction for active participation in a criminal street gang (§ 186.22, subd. (a) [count 10]). Given our reversal on the substantive gang charges, we need not address defendant's claims of instructional error or insufficient evidence regarding those charges. We conclude the court did not err in refusing to order bifurcation or in admitting evidence of defendant's tattoos and their meanings as well as evidence of his involvement in a prior stolen vehicle incident. We find the experts' opinions were based on reliable information and that allowing the gang experts to testify to out-of-court statements underlying those opinions did not violate the confrontation clause. We also conclude that any purported error in admitting defendant's responses to jail classification questions was harmless.

Because we are unable to determine what documents the trial court actually reviewed in denying defendant's *Pitchess* motion, we remand the case to the trial court with directions to hold a hearing to augment the record with any evidence the trial court considered in chambers when it ruled on the *Pitchess* motion.

If the trial court itself did not review such evidence, but instead relied on the representations of the custodian of records or its counsel, the trial court is directed to review the police officer personnel records in camera. If the inspection reveals relevant information, the trial court shall order disclosure, allow defendant an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed. In the event of a new trial, the trial court shall strike counts 9 and 10 from the information. If the inspection does not reveal any relevant information, the judgment as modified by this opinion shall be reinstated.

Finally, we reject defendant's cumulative error argument as any errors that may have occurred, when considered either individually or cumulatively, were harmless.

FACTS AND PROCEEDINGS

A.     The Car Crash

In May 2009, Roric Boese's truck was stolen from his home in Lodi. On May 25, 2009, the truck struck a telephone pole and landed upside down in a ditch near Jahant Road, east of Highway 99. Witnesses saw someone wearing dark colored pants, a green shirt, and a dark jacket get out of the car and limp away from the truck into a vineyard surrounding a nearby dairy.

California Highway Patrol Officer Tony Wold was the first to arrive at the site of the accident. Officer Wold examined the truck and saw damage to the steering column consistent with the vehicle having been stolen. Officer Timothy Fautt also also went to the site of the accident. While Officer Wold secured the crash site, Officer Fautt drove to the nearby dairy looking for the driver who had fled into the vineyard.

B.     Defendant's Encounter with Officer Fautt

Sarah Melendrez lived in a mobile home at the dairy. That morning, defendant knocked on her door and asked her to drive him to a family member's house in Lodi. She refused. He then asked if he could come inside because he had crashed a car he was not supposed to be driving and the police were looking for him. Again she said no. As they were speaking, Ms. Melendrez saw a police car coming toward the house. She began to shut the door as defendant turned and walked down the front porch steps.

As Officer Fautt was driving by Ms. Melendrez's home, he noticed a man -- defendant -- wearing a black sweatshirt and jeans who appeared to be knocking on the front door. After seeing the officer, defendant walked down the steps and away from the house.

4

As defendant walked down the stairs, Officer Fautt saw he was wearing a green shirt underneath the black sweatshirt. Officer Fautt called out to defendant, "Hey, can I talk to you for a minute?" The officer asked defendant if he lived there and defendant said he was visiting his cousin. Officer Fautt then asked defendant to come closer and defendant did so.

The two men walked towards one another. Officer Fautt told defendant he was going to pat him down for weapons and told defendant to turn around and place his hands behind his head. Defendant turned around, but he did not put his hands on his head. Instead, his hands stayed near his waistband out of Officer Fautt's sight.

Officer Fautt again told defendant to put his hands on his head, and he bumped the back of defendant's arms to remind him. Officer Fautt noticed defendant's arms were tense rather than relaxed and he thought defendant might be reaching for something or trying to hide drugs. The officer immediately wrapped his arms underneath defendant's armpits and pulled defendant's hands away from whatever he was attempting to grab. Defendant's arms came upwards and Officer Fautt saw defendant holding a black semiautomatic pistol in his right hand. The gun was loaded and the safety was off. The pistol's grip was wrapped in masking tape, which made a second safety mechanism inoperable.

Immediately after seeing the gun, Officer Fautt tried to pull defendant off balance. The officer could see defendant's fingers in the trigger guard of the gun, and, according to Officer Fautt, defendant was trying to turn the gun towards him.

Officer Fautt yelled at defendant to drop the gun. Due to Officer Fautt's control hold, defendant was unable to turn his wrist any further and the two men remained locked in the same position. Defendant's finger was on the trigger. Officer Fautt yelled at defendant to drop the gun several more times. Defendant replied that he was just trying to give him the gun. Officer Fautt told defendant, "I don't want it," and to "just drop it." At that point, defendant released his wrist, opened his hand and the gun toppled over onto

5

his trigger finger. Officer Fautt then shook defendant's arm and the gun dropped to the ground. The officer swept defendant's feet and swung him away from the gun. Defendant fell on his back and Officer Fautt sat on him with his knees on defendant's chest and called for backup officers.

Officer Wold arrived a short time later. Officer Wold secured the gun and helped Officer Fautt handcuff defendant. Officer Fautt searched defendant prior to placing him in his patrol car. The search produced, among other things, two shaved keys which can defeat a car's ignition system, as well as a tic tac box containing a white substance. Upon later analysis, the white substance was determined to be methamphetamine.

C.     Certain Trial Proceedings

An amended information setting forth 11 counts was filed in August 2010 charging defendant with attempted murder of a peace officer (§§ 664/187, subd. (e) [count 1]), assault on a peace officer/firefighter with a semiautomatic firearm (§ 245, subd. (d)(2) [count 2]), unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a) [count 3]), receiving stolen property, a vehicle (§ 496d, subd. (a) [count 4]), possession of a controlled substance with a loaded, operable firearm (Health & Saf. Code, § 11370.1, subd. (a) [count 5]), possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a) [count 6]), possession of a firearm by a felon (former § 12021, subd. (a), now § 29800, subd. (a) [count 7]), resisting an executive officer (§ 69 [count 8]), possession of a firearm by an active participant in a criminal street gang (former § 12025, subd. (b)(3), now § 25400, subd. (c) [count 9]), active participation in a criminal street gang (§ 186.22, subd. (a) [count 10]), and hit-and-run driving causing property damage (Veh. Code, § 20002, subd. (a) [count 11]). Counts 2, 4, 6 and 8 were alternative to counts 1, 3, and 5. Attached to counts 1, 2 and 8 were various enhancements concerning personal use of a firearm and committing the crimes for the benefit of a criminal street gang. (§§ 12022.53, subd. (b) and (e)(1), 12022.5, subd. (a), 186.22, subd. (b)(1).)

6

1.     Motions in Limine

In October 2010, defendant moved in limine to sever the gang enhancements and substantive gang charges from the remainder of the counts. Defendant also moved in limine under Evidence Code section 352 to exclude any references to gangs or gang membership, all gang expert testimony, and any reference to defendant's tattoos, including a tattoo of the number "187" -- which is the California Penal Code section proscribing murder - on his left index finger and a teardrop tattoo on his right cheek. Defendant separately moved to exclude his statements to jail booking officers that he was a member of the Sureno criminal street gang, claiming the officers violated the holding in *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

At the hearing on the motions in limine in May 2011, the court initially deferred ruling on defendant's severance motion. Defendant did not request that the court rule on the motion before the end of the hearing, and defendant never requested or received a ruling on the motion before trial commenced.

Defendant requested Evidence Code section 402 hearings on whether the offenses charged were done for the benefit of a criminal street gang as well as whether defendant's responses to the booking questions were admissible despite the lack of *Miranda* warnings. The court denied defendant's section 402 hearing request regarding whether the charges were gang related, and later ruled under Evidence Code section 352 that defendant's tattoos were relevant to the gang charges and enhancements as well as to defendant's motive and were not more prejudicial than probative.

The court granted defendant's request for a section 402 hearing on the booking issue. Defendant had admitted his Sureno gang membership on multiple occasions while being booked into the jail. During the section 402 hearing, the booking officers generally testified that they relied on a standard questionnaire that asked whether an incoming inmate is associated or affiliated with any particular gang. They also explained that the

7

questions regarding gang membership and gang affiliation were asked for safety purposes as it is highly dangerous, both for custodial staff and other inmates, if rival gang members or former and active gang members are housed together in the jail. The court ultimately found defendant's responses to the booking officers' gang affiliation questions admissible under *People v. Gomez* (2011) 192 Cal.App.4th 609, 635 (*Gomez*) [based on the record before the court, the prosecution satisfied its burden of showing by a preponderance of the evidence that the questions about defendant's gang affiliation and moniker were booking questions not designed to elicit an incriminating response making defendant's responses admissible despite the absence of *Miranda* warnings].)

The court bifurcated the felony charged in count 7, felon in possession of a firearm. Defendant later waived a jury trial of the prior felony allegation and the court found defendant did have a prior felony for purposes of that count. A jury trial on the remaining charges and enhancements commenced on May 11, 2011.

2. Gang Evidence

The prosecution presented two gang experts at trial. Detective Bradley had been a police officer for over 10 years and had served as a detective in the City of Lodi police department during five of those years. During that time he had investigated over a hundred Hispanic criminal street gang members. He had contacted Sureno gang members, both casually and while in custody, thousands of times. He also received specialized training in Hispanic criminal street gangs. Detective Bradley testified regarding the Sureno criminal street gang as well as about three individuals who were documented Sureno gang members and the predicate crimes for which they had been convicted.

Detective Blandford had been in law enforcement for 10 years, and for the last two years had been a gang detective in the Lodi Police Department's special investigations division. Detective Blandford received specialized training from the California Gang

8

Investigators' Association in Hispanic criminal street gangs. He also attended a school for gang investigators. As part of his duties as a gang detective, Detective Blandford constantly contacted gang members, both in the community and in custody, investigated gang-related cases, and identified gang members. He received reports from patrol officers and reviewed field contact information concerning gangs. Over the course of his career he had contacted around 500 gang members and had been involved in at least 60 gang investigations.

Detective Blandford testified regarding Hispanic criminal street gangs and the pattern offenses of the Sureno gang, including, assaults involving weapons, vehicle thefts and narcotics sales. In Sureno gang culture, assaulting a law enforcement officer was the ultimate way to achieve status in the gang. Detective Blandford opined that defendant's 187 tattoo on his finger and teardrop tattoo on his face meant defendant was fully committed to the Sureno gang and that the tattoos indicated he was claiming he had previously killed someone. Based on his training and experience with Sureno gangs, defendant's responses to jail classification interviews where he self-identified as an active Sureno gang member, defendant's tattoos, which Detective Blandford characterized as gang-related, and evidence showing defendant often wore blue -- a color associated with the Sureno gang -- Detective Blandford concluded defendant was an active participant in the Sureno criminal street gang.

The jury also heard evidence that gang drawings were found in defendant's cell while in jail awaiting trial on the charges, that defendant had three dots tattooed on his wrist, which was a Sureno street gang symbol, and that he had previously pleaded guilty to receiving a stolen vehicle under Penal Code section 496d based on an earlier incident in which he told an arresting officer he had obtained a known stolen vehicle from an Hispanic man with three dots tattooed under his eye.

9

### 3. The Defense

Defendant did not testify. He did, however, call Ms. Melendrez as a witness. She testified that after telling defendant she would not drive him to Lodi and would not allow him into the house to wait until the patrol car passed, she went back to her bedroom located directly below the porch stairs. She looked out her window and saw an officer with defendant. She heard the officer ask defendant for identification and whether he lived there. Defendant said that he was visiting a family member or a friend. She assumed the police officer was handling the situation, so she left the window and sat on her bed, which was approximately a foot away from the window. She then heard the officer yell "drop the gun." She heard the officer repeat the command using profanity. She ran back to the window and saw the officer standing behind defendant in a frisking position. Defendant was pointing the gun up in the air; she did not see the gun pointed at the officer.

In closing arguments, defense counsel argued defendant's theory of the case based on the evidence presented: that defendant had not tried to kill Officer Fautt nor had he pointed the gun at the officer. Instead, defendant was merely trying to give Officer Fautt the gun.

### 4. The Verdicts

The jury returned guilty verdicts as to counts 1, 3, 5, 7, 9, 10, and 11. The jury found the enhancement allegations attached to count 1 that defendant personally used a firearm pursuant to section 12022.53, subdivision (b), and that the personal firearm use was for the benefit of a street gang under section 12022.53, subdivision (e)(1) were true, but found the criminal street gang enhancement under section 186.22, subdivision (b) was not true. Based on the court's instructions, the jury did not return verdicts on alternative counts 2, 4, 6, and 8.

Defendant moved for a new trial arguing, among other things, that the jury's enhancement findings as to count 1 were inconsistent. The court agreed and struck the jury's true finding under section 12022.53, subdivision (e)(1). In all other respects the court denied the motion.

The court later sentenced defendant to life in prison with the possibility of parole for the attempted murder of Officer Fautt in count 1, and to an additional 10 years for the personal gun use enhancement under section 12022.53, subdivision (b). The court sentenced defendant to a consecutive sentence of eight months for the unlawful driving or taking of a vehicle in count 3, and to concurrent sentences of four years for count 5, three years for count 7, three years for count 9, three years for count 10, and 180 days for count 11.

DISCUSSION

I

*Bifurcation*

Defendant argues the trial court should have bifurcated the trial, with guilt of the underlying charges tried first and the truth of the gang enhancement allegations and substantive gang offenses tried second. According to defendant, the trial court's failure to order bifurcation rendered the trial fundamentally unfair and violated his constitutional rights. The People say defendant failed to preserve the issue for appeal and that in any event bifurcation was not required.

We conclude defendant forfeited the bifurcation issue on appeal by failing to move to bifurcate below. Even if defendant's motion to sever is treated as a motion to bifurcate, however, we still agree defendant forfeited his challenge. Finally, had the issue been preserved, the trial court would not have erred in denying a bifurcation motion.

Defendant requested that the court sever the gang enhancements and gang offenses from the remaining charges in a motion in limine filed in October 2010. At a hearing

11

seven months later, on May 4, 2011, the court considered the parties' motions in limine. The court initially deferred ruling on defendant's motion in limine concerning severance and proceeded to consider the other in limine motions. The motion in limine hearing concluded without the trial court ever expressly ruling on defendant's severance motion.

A few days later, and prior to the commencement of jury selection, the court held a section 402 hearing to consider whether to admit evidence of defendant's responses to jail booking questions that he was a Sureno gang member, and also to consider the admissibility of evidence of defendant's 187 and teardrop tattoos. Defendant did not raise the severance issue during this hearing or press the court for a ruling on the deferred severance motion.

Trial commenced the next day. The record discloses no further discussion of or ruling on any motion to sever the gang enhancements and gang offenses from the remainder of the charges. Instead, the People called Detective Paul Blandford of the Lodi Police Department as their first witness. He was qualified as an expert in the area of Hispanic criminal street gangs without objection and proceeded to testify regarding gang related topics.

In this case, the record shows defendant moved to sever, not bifurcate, the substantive gang charges and gang enhancements. While the concepts are similar they are not interchangeable. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050 (*Hernandez*) [recognizing that analogy between bifurcation and severance is not perfect].) Whenever a court severs charged offenses, such offenses are tried separately to a separate jury. (*Ibid.*) "[A] bifurcated trial is held before the same jury, and the gang enhancement would have to be tried only if the jury found the defendant guilty." (*Ibid.*) Because defendant never moved to bifurcate, the point has been forfeited. (*Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 412 ["Generally, failure to raise an issue or argument in the trial court *waives* the point on appeal"].)

Even if we treat defendant's severance motion as a motion to bifurcate, we still find defendant failed to preserve the issue for appeal. This is because defendant never pressed for a ruling on the motion prior to trial. (*People v. Cunningham* (2001) 25 Cal.4th 926, 984 (*Cunningham*) [failure to press trial court for ruling on motion to sever waives the issue on appeal]; *People v. Pinholster* (1992) 1 Cal.4th 865, 931 [same], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) " ' '[W]here the court, through inadvertence or neglect, neither rules nor reserves its ruling . . . the party who objected must make some effort to have the court *actually rule*. If the point is not pressed and is forgotten, [the party] may be deemed to have waived or abandoned it, just as if he had failed to make the objection in the first place." ' " (*People v. Braxton* (2004) 34 Cal.4th 798, 813 (*Braxton*).)

Defendant's reliance on *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 (*Reid*), for the proposition that merely raising the severance issue in a motion in limine *by itself* preserves the issue for appellate review is misplaced. In *Reid,* our Supreme Court held that when a trial court ruling on a summary judgment motion "fails to rule expressly on specific evidentiary objections, it is presumed that the objections have been overruled . . . and the objections are preserved on appeal." (*Reid*, at p. 534.) In reaching this conclusion, however, the Supreme Court was required to construe the plain language of the summary judgment statute, something not at issue here. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 118 ["an opinion is not authority for a proposition not therein considered"].) Indeed, this is not a summary judgment case and defendant has not cited any cases applying *Reid* outside the summary judgment context.

*Reid*, moreover, neither addressed nor overruled the litany of decisions finding that an individual is required to press the trial court for a ruling on an evidentiary motion in order to preserve the issue for appeal. (See e.g., *Braxton, supra,* 34 Cal.4th at p. 813 [citing *Cunningham, supra,* 25 Cal.4th at p. 984 [failure to "press for a ruling" on motion to sever forfeited the issue on appeal]; *People v. Bolin* (1998) 18 Cal.4th 297, 312-313

13

[same; venue motion]; *People v. Pinholster, supra,* 1 Cal.4th at p. 931 [same; motion to sever]; *People v. Morris* (1991) 53 Cal.3d 152, 195 [objection to admission of evidence forfeited on appeal by failure to press for a ruling]; *People v. Hayes* (1990) 52 Cal.3d 577, 618-619 [same]].)  We conclude that the general rule that a party must press the court for a ruling or risk forfeiture still applies.  (*Braxton, supra,* 34 Cal.4th at p. 813.)  Because defendant failed to press for a ruling on his motion, he has forfeited his challenge on appeal.

In any event, the trial court would not have erred in denying a motion to bifurcate.  Although a trial court has discretion to order bifurcation under section 1044, which vests the trial court with broad discretion to control the conduct of a criminal trial, no statute expressly requires bifurcation of street gang enhancements or substantive gang charges.  (*Hernandez, supra,* 33 Cal.4th at p. 1048.)

Where the criminal street gang enhancement has been charged, as in this case, the Supreme Court has recognized that there is less need to bifurcate since "the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense . . . ."  (*Hernandez, supra,* 33 Cal.4th at p. 1048.)  Conversely, a trial court's discretion to deny bifurcation of a charged gang enhancement is broader than its discretion to admit gang evidence when the gang enhancement is not charged.  (*Id.* at p. 1050.)  And, "[t]o the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary."  (*Id.* at pp. 1049-1050.)  That is precisely the circumstance present here.

In this case, defendant was charged multiple times with the street gang enhancement under section 186.22, subdivision (b)(1) (counts 1, 2, and 8), and with two separate substantive gang offenses.  (§ 186.22, subd. (a) [active participation in a criminal street gang] and § 12025, subd. (b)(3) [possession of a firearm by an active participant in a criminal street gang].)  The gang evidence, then, was relevant not only to the gang

enhancements but also to two substantive gang offenses. The evidence, moreover, was relevant to defendant's motive for the attempted murder charge as the trial court so found. (*Hernandez, supra,* 33 Cal.4th at p. 1049 ["Evidence of the defendant's gang affiliation -- including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like -- can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime"].)

Detective Blandford testified that, in his expert opinion, killing a law enforcement officer constitutes the ultimate offense for a Sureno gang member. Committing such a violent act would elevate a gang member's status not only within the gang but also within the community at large by instilling fear in the police and members of the public. Evidence of defendant's gang ties helped explain why defendant would have pulled the gun on Officer Fautt during their encounter instead of simply telling the officer he had the weapon when Officer Fautt told him he was going to frisk him for weapons. Such evidence also tended to support Officer Fautt's testimony that defendant was trying to turn his wrist and point the gun back towards the officer and to discredit Ms. Melendrez's testimony that defendant was merely pointing the gun up in the air and not at the officer.

Under the circumstances, defendant has failed to satisfy his burden of clearly showing that there was a substantial danger of prejudice requiring that the charges be separately tried. This is especially so given the " 'additional factors favor[ing] joinder.' " (*Hernandez, supra,* 33 Cal.4th at p. 1050 [" 'Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials' "].) The trial court, therefore, would have been well within its discretion to deny bifurcation had defendant pressed for a ruling on his motion.

15

## II

### *Active Participation in a Criminal Street Gang*

Defendant was convicted for actively participating in a criminal street gang (§ 186.22, subd. (a) [count 10]) and possessing a firearm as an active participant in a criminal street gang. (Former § 12025, subd. (b)(3), now § 35400, subd. (c) [count 9].) The People concede defendant could not be convicted of these offenses given the fact he acted alone. (*People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*).) We accept the People's concession.

In *Rodriguez,* the Supreme Court concluded subdivision (a) of section 186.22 requires proof that a defendant promoted, furthered, or assisted felonious conduct by *members* of the gang, and that this element is not satisfied when a defendant acts alone in committing a felony. (*Rodriguez, supra,* 55 Cal.4th at pp. 1131-1132.) Because the evidence demonstrated defendant acted alone in this case, the evidence does not support his convictions for violating section 186.22, subdivision (a), or former section 12025, subdivision (b)(3), which includes as one of its elements that a defendant violated section 186.22, subdivision (a). We therefore reverse his convictions on counts 9 and 10 of the amended information.

## III

### *Instructional Error*

Defendant contends the trial court erred in instructing the jury regarding the requirements for proving a violation of section 186.22, subdivision (a) -- active participation on a criminal street gang. Because we reverse defendant's conviction for that charge, we need not reach defendant's instructional error challenge.

IV

*Evidence Code Section 352*

Defendant contends the trial court twice erred under Evidence Code section 352 by permitting the People to present evidence that was more prejudicial than probative; first, by admitting evidence of defendant's tattoos and their significance, and, second, by admitting evidence that defendant had previously pleaded guilty to receiving a stolen vehicle. These purported errors, he claims, deprived him of his constitutional due process rights to a fair trial and violated state law.

Under Evidence Code section 352, a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The prejudice referred to in section 352 is not the prejudice to a defendant that naturally flows from probative evidence tending to demonstrate guilt of a charged offense, but rather the prejudice resulting from " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

"Trial courts exercise discretion in determining both the admissibility of evidence under Evidence Code section 352 [citation], and a witness's expert status [citation]." (*People v. Ochoa* (2001) 26 Cal.4th 398, 437 (*Ochoa*), disapproved on other grounds in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.) Reversal is warranted only when " ' "the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ochoa* at pp. 437-438.) We conclude the trial court properly exercised its discretion in admitting evidence of

defendant's tattoos and their significance as well as evidence of his prior conviction for receiving a stolen vehicle.

A.    Defendant's Tattoos and Expert Testimony Regarding Their Significance

After conducting a 402 hearing, the trial court permitted the People to present evidence that defendant had the number "187" tattooed on his left index finger and evidence that defendant had a teardrop tattoo on his right cheek.  In denying defendant's request to exclude the evidence under Evidence Code section 352, the trial court found that the tattoo evidence was relevant to the gang enhancements as well as the substantive gang charges and to defendant's possible motive on the attempted murder charge.  The trial court also permitted the gang expert to testify that each tattoo signified that the person with the tattoos was likely claiming he had killed someone.

On appeal, defendant argues the probative value of the tattoo evidence was negligible.  We do not agree.  Evidence that defendant had several gang tattoos was probative of the gang enhancements and the substantive gang offenses.  (See e.g., *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331 [expert testimony based on a review of booking photos showing the defendant's tattoos constitutes substantial evidence that defendant was an active gang member for purposes of § 186.22, subd. (a)].)  And, as the trial court reasonably found, the tattoo evidence was highly probative of defendant's motive during his encounter with Officer Fautt.  (*Hernandez, supra,* 33 Cal.4th at p. 1049 [gang signs and symbols can help prove motive and specific intent]; *People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*) [evidence of defendant's gang affiliation can prove motive and identity]; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 ["expert testimony repeatedly has been offered to show the 'motivation for a particular crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang' "].)

18

The prosecution's theory below was that defendant attempted to shoot Officer Fautt as a way of committing what the gang expert considered to be the ultimate gang crime -- killing a police officer. Defendant's highly visible tattoos, which were located on his face and hand, tended to prove defendant's status and level of commitment to his gang, making it more likely that he tried to shoot the officer rather than simply hand him the gun as he later claimed. Given its tendency to establish defendant's motive, then, the tattoo evidence presented in this case was more probative than prejudicial. (*People v. McKinnon* (2001) 52 Cal.4th 610, 655 [" ' "[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence" [Citation.]' "] (*McKinnon*).)

That defendant had the tattoos before being charged in this case does not mean the tattoos were somehow less probative than the 187 tattoo at issue in *Ochoa* as defendant argues. Although the *Ochoa* court found that the defendant's "187" tattoo, which he got while incarcerated and awaiting trial, represented an admission of the defendant's conduct and a manifestation of his consciousness of guilt, the court did not limit the admissibility of a 187 tattoo and its significance to those circumstances alone. (*Ochoa, supra,* 26 Cal.4th at p. 438.) As noted above, evidence of one's gang affiliation, including gang tattoos, are probative of a defendant's motive for engaging in certain criminal behavior. (*Hernandez, supra,* 33 Cal.4th at p. 1049; *Williams, supra,* 16 Cal.4th at p. 193; *McKinnon, supra,* 52 Cal.4th at p. 655.)

We also find unpersuasive defendant's argument that the tattoos were less probative because they possibly represented sorrow or an empty boast. "Such argument concerns only the weight of this evidence, not its admissibility, which does not require complete unambiguity." (*Ochoa, supra,* 26 Cal.4th at p. 438 [although "187" tattoo could have highlighted defendant's connection to a gang subset rather than Penal Code section 187, which proscribes murder, the tattoo evidence was still admissible].)

19

Defendant's reliance on *People v. Guizar* (1986) 180 Cal.App.3d 487 (*Guizar*), moreover, is misplaced. *Guizar* involved a defense counsel's failure to object to the admission of a taped statement in which a witness stated the defendant, on trial for murder, had committed other murders. (*Id.* at p. 491.) The defendant in *Guizar*, however, admitted that he had committed the murder with which he was charged; the only issue was the defendant's degree of guilt. (*Id.* at p. 490.) Because the defendant in *Guizar* admitted to killing the victim, his motive was irrelevant.

In this case, by contrast, defendant denied trying to kill Officer Fautt. Defendant's theory at trial was that he was merely trying to hand the officer his gun and that he never pointed the gun at the officer. Unlike *Guizar*, then, whether defendant had a motive or incentive to kill Officer Fautt was highly probative of the actions he took during his encounter with the officer. And evidence of the meaning of defendant's tattoos undoubtedly aided the jury in comprehending an incident that, to an ordinary citizen, might seem illogical. (*People v. Gonzalez, supra,* 126 Cal.App.4th at p. 1551 ["The law does not disfavor the admission of expert testimony that makes comprehensible and logical that which is otherwise inexplicable and incredible"].) The trial court, therefore, properly exercised its discretion in admitting the tattoo evidence and in permitting the gang expert to describe the significance of the tattoos. (*Ochoa, supra,* 26 Cal.4th at pp. 438-439 [expert testimony regarding gang-related meaning of tattoos admissible].)

The trial court, moreover, instructed the jury that it could not consider evidence of gang activity for the purpose of concluding that defendant was a person of bad character or someone that had a criminal disposition. We presume the jury followed these instructions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25-26 (*Lindberg*).)

Defendant's attempt to carve out the tattoo evidence and the testimony regarding their significance from the meaning of the phrase "evidence of gang activity" as it relates to the above jury instruction is unavailing. According to defendant, the tatoo evidence does not "obviously fall within the category of 'evidence of gang activity.' "

20

Evidence of the tattoos as well as their meaning came in through the gang expert. The underlying premise of the gang expert's testimony was that the tattoos were well known gang tattoos that demonstrated defendant's status or level of commitment to his gang, especially since the tattoos were in visible places such as his face and hands. Defendant's tattoos, as well as the expert testimony regarding their meaning, qualify as "evidence of gang activity" as used by the court when instructing the jury.

Because we reject defendant's argument that the trial court abused its discretion by admitting evidence of defendant's tattoos and their meanings, we likewise reject defendant's contention that the admission of the tattoo evidence violated his constitutional rights to due process and a fair trial. It has long been observed that "[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." (*Lindberg, supra,* 45 Cal.4th at p. 26 [citing *People v. Kraft* (2000) 23 Cal.4th 978, 1035].) Defendant's case presents no exception to this general rule.

B.    Stolen Vehicle Evidence

Defendant had previously pleaded guilty to violating section 496d, receiving stolen property. The prosecution sought to introduce the circumstances surrounding defendant's prior arrest and conviction, arguing that the incident qualified as a violation of Vehicle Code section 10851, which is one of the primary activities of a criminal street gang under section 186.22, subdivision (f). According to the prosecutor, defendant's prior arrest and section 496d conviction was probative of defendant's involvement in and knowledge of the primary activities of the Sureno criminal street gang.

Defendant objected on various grounds, including that the evidence was more prejudicial than probative under Evidence Code section 352. Following an Evidence Code section 402 hearing, the court overruled the objection and permitted the prosecution to elicit the following testimony from the arresting officer at trial: On August 20, 2007,

Officer Sophia Mosqueda went to a disabled vehicle call near the intersection of Thornton Road and Peltier Road in San Joaquin County. Upon arriving at that location, she saw two people inside a Honda Civic parked on the side of the road. Defendant got out of the driver's seat and, without prompting, told Officer Mosqueda's partner that he thought the vehicle was stolen.

Officer Mosqueda advised defendant of his *Miranda* rights, which he waived. Defendant then told the officer after his ride left him stranded at a party, he asked another friend to drive him home. The friend told defendant he knew a man who could loan defendant a car. The Hispanic man had three dots under his left eye and defendant did not know him. The man took defendant and defendant's cousin to the Honda Civic. The car was unlocked and defendant noticed the steering column was broken. Defendant's cousin gave him a random key, which he used to manipulate the ignition and start the vehicle. Defendant admitted to driving the car and to knowing it was stolen immediately after seeing the broken steering column.

On appeal, defendant argues admitting the evidence of defendant's prior 496d conviction rendered his trial fundamentally unfair thereby violating his constitutional right to due process. Defendant claims the prior section 496d evidence was highly inflammatory and would have swayed the jury to convict in this case in order to punish him for this prior conduct.

The evidence had substantial probative value regarding defendant's knowledge of the primary activities of Sureno gang members. The man from whom defendant obtained the car had three dots tattooed underneath his eye. Evidence during trial established that three dots were a symbol of the Sureno criminal street gang and that one of the primary activities of Sureno gang members is vehicle theft. Defendant's 496d conviction for receiving a stolen vehicle coupled with the fact that he admitted getting the vehicle from an Hispanic male with a Sureno gang tattoo tended to prove defendant's knowledge for purposes of the gang statutes. (§ 186.22, subd. (a) ["Any person who actively

22

participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity . . ."].)

The evidence, moreover, was not particularly inflammatory compared with what defendant was primarily accused of doing here -- trying to point a loaded weapon at an officer's head in an attempt to kill him. (*Hernandez, supra,* 33 Cal.4th at p. 1051 [evidence that some gang members had been convicted of driving a vehicle without the owner's consent was not inflammatory in context of defendant's robbery trial].) Indeed, during closing arguments, defense counsel focused primarily on the attempted murder charge and barely referenced the other charges. The prosecutor asked only that the jury "hold the prosecutor to the burden of proof of each and every element" of the vehicle charges.

And the fact that defendant had already been convicted and punished for receiving the stolen vehicle made the evidence even less inflammatory. (*Hernandez, supra,* 33 Cal.4th at p. 1051 [gang evidence admitted to prove gang enhancement not inflammatory since it was not evidence of offenses for which a defendant might have escaped punishment]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [although the prejudicial effect of evidence was heightened where defendant's uncharged acts did not result in criminal convictions, the evidence was nevertheless admissible under the circumstances because it was highly probative of a common plan or design to molest victims].)

Finally, we reject defendant's argument that because he was charged in count 3 with the unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a)), and, alternatively, in count 4 with receiving a stolen vehicle (§ 496d, subd. (a)), the evidence of defendant's 496d conviction should have been excluded since the jury might have viewed defendant as being predisposed to commit that type of crime. While it is generally true that evidence of prior crimes is inadmissible to prove a defendant had the propensity or disposition to commit a charged crime, such evidence is admissible when

23

relevant to prove a defendant's knowledge or intent like in this case. (*Lindberg, supra,* 45 Cal.4th at p. 22.) For example, in *Lindberg* the probative value of evidence that the defendant had engaged in several uncharged robberies, including evidence that the defendant assaulted each victim during the commission of those crimes, was not substantially outweighed by the potential for undue prejudice because the evidence was highly probative of whether the defendant intended to rob the decedent at the time of the murder and robbery for which he was on trial. (*Lindberg, supra,* 45 Cal.4th at p. 25.)

The same is true here. Evidence of defendant's past stolen vehicle incident had a tendency to prove he had knowledge of and engaged in one of the primary activities of the Sureno street gang -- vehicle theft. (See also *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323, as modified (Oct. 17, 2001) [evidence of past offenses has some tendency in reason to show a group's primary activity].)

The trial court, therefore, properly exercised its discretion in admitting the evidence surrounding defendant's prior 496d conviction. Because no error occurred, we reject defendant's contention that the admission of this evidence violated his constitutional right to a fair trial. (*Lindberg, supra,* 45 Cal.4th at p. 26 [" '[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights' "].)

V

*Gang Expert Testimony*

Defendant's challenge to the gang expert testimony is two-fold. First, defendant argues the gang experts' opinions were based on unreliable material. Second, defendant objects that the gang experts were permitted to testify about out-of-court statements serving as the basis of their opinions (basis evidence), which were not independently admitted nor were the declarants subjected to cross-examination. Defendant contends

24

allowing the experts to testify to this basis evidence violated his right to confront the witnesses against him under the Sixth Amendment to the United States Constitution.

California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720), and to give testimony in the form of an opinion. (Evid. Code, § 801.) Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of that testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "The subject matter of the culture and habits of criminal street gangs . . . meets this criterion." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)

Evidence Code section 801 limits expert testimony to an opinion that is "[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . ." (Evid. Code, § 801, subd. (b).) An expert may base his opinion on material that is not admitted into evidence if the material is of a type that is reasonably relied upon by experts in the particular field in forming their opinions and so long as the material is reliable. (*Gardeley, supra,* 14 Cal.4th at p. 618.)

Once the reliability threshold is satisfied, "even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony." (*Gardeley, supra* 14 Cal.4th at p. 618; *In re Fields* (1990) 51 Cal.3d 1063, 1070 [expert witness can "base an opinion on reliable hearsay, including out-of-court declarations of other persons"].) "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion in based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley, supra,* 14 Cal.4th at p. 618.)

A trial court generally has "broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) When the issue is whether admission of evidence violated the federal Constitution, such as the confrontation clause, we review the matter de novo. (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553.) With these concepts in mind, we consider each of defendant's arguments in turn.

A.     Reliable Bases for Gang Expert Opinions

Detective Blandford opined defendant was an active participant in the Sureno criminal street gang (§ 186.22, subd. (a)), and that attempting to kill Officer Fautt benefited the gang. (§ 186.22, subd. (b)(1).) Detective Blandford based his opinion on his training and experience, reports prepared by other officers, and on his almost daily contacts with gang members while on patrol and later while working as a gang detective for the City of Lodi. Detective Bradley, who also qualified as a gang expert, similarly based his opinions on his training and experience and on his numerous contacts with gang members.

Defendant contends the trial court erred in admitting the gang experts' testimony because the testimony was based on unreliable material. According to defendant, because Detective Blandford admitted gang members lie to him, his expert opinion could not have been based on reliable material as required under California law.

Defendant correctly notes that expert testimony must be based on " 'material of a type that is reasonably relied upon by experts in the particular field in forming their opinions.' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 948 (*Gonzalez*).) But, the fact that the detective admitted the obvious -- that sometimes gang members lie -- does not mean his opinion was based on unreliable material.

26

The Supreme Court rejected a similar argument in *Gonzalez.* There, the defendant argued the trial court erred in denying a trial motion to strike a gang expert's testimony after the expert, who was a police officer, conceded on cross examination that sometimes he interviewed people who did not always provide truthful or accurate information. (*Gonzalez, supra,* 38 Cal.4th at pp. 947-948.) Such a concession, the Supreme Court found, did not render the expert's opinion unreliable. (*Id.* at p. 949.) Instead, the expert witness "merely admitted the obvious -- that people 'in the street' sometimes lie." (*Ibid.*)

Because the expert witness never said he based his opinion solely on unreliable information, and since his opinion was not based on information from a single person but on " 'corroborative information from other citizen informants, other evidence that we have at hand, reports, [and] people from the community," the Supreme Court found nothing unreliable about the expert's testimony. (*Gonzalez, supra,* 38 Cal.4th at p. 949.) "A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable." (*Ibid.*)

Like the gang expert in *Gonzalez,* Detective Blandford testified that he bases his opinion on multiple sources and does not simply take what various gang members tell him at face value. He explained that he relies on surveillance to verify or refute things that gang members have told him. He also interviews citizen witnesses that "don't have a dog in the fight" to piece together what actually occurred during an alleged incident. He reviews reports from other law enforcement officers. He has had extensive training in gang investigations and had investigated gang members both while on patrol and as a gang detective. Thus, Detective Blandford's opinion was based on a multitude of sources and on his many years of experience rather than simply on a single, questionable source. (See also *People v. Valadez* (2013) 220 Cal.App.4th 16, 29 (*Valadez*) [finding trial court properly admitted gang expert's testimony after recognizing that "while individual sources such as gang members might be reasonably questioned, [the gang expert] did not rely on these sources alone or simply recite statements by others; he fit the information

27

into all the other sources and his own experience to render his opinion"]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1125-1126 (*Hill*) ["But simply because a gang member has lied to the police in the past about his possession of contraband does not preclude a conclusion that he is a reliable source of information supporting a gang expert's opinion"].)

The bases of the experts' opinions, when considered in context, were reliable. (*Gonzalez, supra,* 38 Cal.4th at p. 949.) The court, therefore, did not abuse its discretion in admitting the expert gang testimony even though Detective Blandford conceded that sometimes gang members are not entirely truthful.

B.      Confrontation Clause

Having determined that the experts' opinions were based on reliable information, we next consider whether allowing the gang experts to testify to the basis for their opinions, which often consisted of out-of-court statements by nontestifying declarants, violated defendant's right to confront the witnesses against him under the Sixth Amendment's confrontation clause. (U.S. Const., 6th Amend.)

Defendant did not challenge the gang expert testimony or gang evidence on confrontation clause grounds below, and the People argue defendant has forfeited the issue. While some courts have found that a defendant's failure to raise a confrontation clause challenge forfeits the issue on appeal (see e.g., *People v. Tafoya* (2007) 42 Cal.4th 147, 166 [defendant forfeited confrontation clause challenge by failing to object to trial court's evidentiary ruling on that ground]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19 [defendant forfeited confrontation clause claim by failing to raise it at trial]), others have excused the failure to raise such a challenge where " 'governing law at the time . . . afforded scant grounds for objection.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 704 [considering confrontation clause challenge on merits despite

28

defendant's failure to raise issue during trial].)  Following the latter course, we shall address defendant's confrontation clause challenge.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford* ), the Supreme Court held the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  (*Id.* at pp. 53-54.)  The clause, however, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  (*Id.* at p. 59, fn. 9 [citing *Tennessee v. Street* (1985) 471 U.S. 409, 413-414 [485 L.Ed.2d 425] [respondent's rights under the confrontation clause were not violated when an accomplice's out-of-court confession was introduced for the nonhearsay purpose of rebutting respondent's testimony that his own confession was coercively derived from the accomplice's statement].)

1.      Purpose of the Basis Evidence

Because the confrontation clause does not prohibit introducing out-of-court statements for purposes other than proving the truth of the matter asserted (*Crawford, supra,* at p. 59, fn. 9), we first consider the purpose of the basis evidence in this case. Notwithstanding defendant's argument to the contrary, we are bound by the Supreme Court's decision in *Gardeley*, which found that hearsay statements testified to by a gang expert as a basis for his or her expert opinion are not offered for their truth but instead are offered merely to evaluate the expert's opinion.  (*Gardeley, supra,* 14 Cal.4th at pp. 618-619; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction"].)

While bound by *Gardeley*, we recognize that some courts have questioned the premise that out-of-court statements upon which an expert's opinion is based are not offered for their truth.  (See e.g., *Hill*, *supra*, 191 Cal.App.4th at pp. 1129-1130.)  In *Hill*, for example, the court observed that *Gardeley* was based on an "implied assumption that the out-of-court statements *may help the jury evaluate the expert's opinion without regard to the truth of the statements*.  Otherwise, the conclusion that the statements should remain free of *Crawford* review because they are not admitted for their truth is nonsensical."  (*Ibid.*; italics added.)  The court noted, however, that that "assumption appears to be incorrect."  (*Ibid.*)  In the court's view, the only way the jury could properly evaluate the expert's opinion was to assume the truth or falsity of the out-of-court statement.  (*Id.* at p. 1131 ["where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion"].)

Recently, two divisions in the Fourth District came to opposite conclusions on the issue.  The Supreme Court has granted review in both cases.  (See *People v. Sanchez*, previously published at (2014) 223 Cal.App.4th 1, review granted and opinion superseded May 14, 2014; and *People v. Archuleta*, previously published at (2014) 225 Cal.App.4th 527, review granted and opinion superseded June 11, 2014.)

We need not resolve the issue here, however.  This is because the basis evidence of which defendant complains is not testimonial within the meaning of *Crawford* and its progeny.  Introducing the basis evidence through the experts' testimony, then, did not run afoul of the Sixth Amendment's confrontation clause.

2.     Testimonial Nature of Basis Evidence

To be subject to the confrontation clause, out-of-court statements must be "testimonial."  (*Crawford, supra,* 541 U.S. at p. 59.)  But *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial.'  Whatever else the

term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" (*id.* at p. 68), which, under the facts of the case, included recorded statements by a witness in response to structured police questioning. (*People v. Cage* (2007) 40 Cal.4th 965, 978 (*Cage*) [explaining *Crawford*].) Later cases have spoken to the meaning of the word "testimonial" in this context.

Two years after deciding *Crawford*, the United States Supreme Court clarified in *Davis v. Washington* (2006) 547 U.S. 813, 822 [165 L.Ed.2d 224] (*Davis*), that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis* considered statements in two different factual contexts. The court found statements by a domestic violence victim in a 911 call made during on ongoing emergency were nontestimonial. (*Id.* at p. 827.) By contrast, statements by a different domestic violence victim in her home to the police where the assault was over and the police had moved the victim to a separate room away from the suspect for questioning were testimonial. (*Id.* at pp. 829-830.)

In *Michigan v. Bryant* (2011) 562 U.S. 344 [179 L.Ed.2d 93] (*Bryant*), the Supreme Court interpreted *Davis* as making clear that "not all those questioned by the police are witnesses and not all 'interrogations by law enforcement officers,' [citation], are subject to the Confrontation Clause." (*Id.* at p. 355.) To determine the primary purpose of a police investigation, courts must objectively evaluate the circumstances of an encounter and the statements and actions of the parties, including the existence of an ongoing emergency and the formality or informality of the exchange. (*Id.* at p. 366.) In *Bryant*, for example, the court found that the primary purpose of a police interrogation of

31

a victim, found in a public place who was suffering from a fatal gunshot wound, was not to create a record for trial but to respond to an ongoing emergency to the public and to the police since the whereabouts of the shooter were still unknown. (*Id.* at pp. 355, 357-360.) The victim's statements identifying the shooter and describing where and how the shooting occurred were not testimonial and did not implicate the confrontation clause. (*Ibid.*)

While the court in *Bryant* found an ongoing emergency under the facts presented, it also recognized that there may be other circumstances, aside from ongoing emergencies, when a statement to law enforcement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. (*Bryant, supra,* 562 U.S. at pp. 358-359.) "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." (*Ibid.*)

In *Cage*, the California Supreme Court found a victim's statement made to a police officer one hour after an assault was testimonial where the primary purpose of the conversation was to investigate the prior assault. (*Cage, supra,* 40 Cal.4th at pp. 984-986.) The court reached a different conclusion regarding similar statements made by the victim to the treating physician at the emergency room. (*Id.* at pp. 986-987.)

In so doing, the court derived "several basic principles" from *Davis* and concluded that "the proper focus" in determining whether a statement is testimonial "is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial." (*Cage, supra,* 40 Cal.4th at p. 984, fn. 14.) Instead, the confrontation clause is "concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*Ibid.*) Applying these principles to the present case, we conclude that when viewed objectively, the primary purpose of the evidence of which defendant complains was not to prove facts for a possible criminal trial against defendant and the

32

conversations from which the evidence was derived had none of the formality or solemnity that characterizes testimony by witnesses.

Defendant essentially objects to the general background information Detectives Blandford and Bradley testified to about the history of the Sureno gang, how it operates, its primary activities, its signs and symbols, and the meanings of various gang tattoos. We do not consider such general background information testimonial for confrontation clause purposes. (*Valadez*, *supra*, 220 Cal.App.4th at p. 35 [obtaining general background information about a gang by talking with experienced officers, reading written materials and discussing the history of the gang in casual conversations with gang members not testimonial under *Crawford*].)

The experts testified that they obtained this general background information by talking with gang members and other officers, from attending specialized training sessions about gangs, from reading written materials concerning gangs and gang activity, and through their own on-the-job experience investigating gangs. Much of this information was gathered on a daily basis through casual, consensual encounters with gang members. There is no evidence to suggest any of this information bore any degree of solemnity or formality as required under the confrontation clause. It is simply the type of information that one obtains when one becomes an expert in this field of activity.

The fact that some of these conversations took place with people in custody does not change our conclusion. "The custodial status of the interviewees, without more, is not enough" to render a particular exchange testimonial. (*Hill, supra,* 191 Cal.App.4th at p. 1136 [interviews with gang members in custody about the rivalry between two gangs were not testimonial].) There is no basis in the record to conclude that the detectives' interviews were part of a specific criminal investigation. Any statements elicited in these interviews "are no more testimonial than the facts recited in a treatise read by an expert in an academic setting, as he or she develops expertise in the field." (*Ibid.*)

33

Indeed, noticeably absent from the experts' description of their discussions with gang members is any objective indication that the primary purpose of their questioning was to target defendant or any particular individual for a criminal investigation. (*Valadez, supra,* 220 Cal.App.4th at p. 36 [that an officer used the general background information he obtained from gang members to testify as a gang expert at trial does not mean his primary purpose in obtaining this information was to use it against the defendant in a later criminal prosecution].) Instead, the detectives "merely educated [themselves] about the history of gangs in an area in which [they were] assigned as a gang officer, which would help [them] better understand and perhaps more effectively investigate gang activity." (*Ibid.*) As the *Valadez* court recognized, "[d]ay in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some unspecified criminal prosecution." (*Ibid.*)

Here, it is apparent that the primary purpose for gathering such information was to be aware of and knowledgeable about gang activity in order to protect the witnesses' community from gang crime and gang violence.

Defendant also characterizes as testimonial evidence that he had, on occasion, hung out with Sureno gang members. Such basis evidence arguably may be different from the general gang background information discussed above because it directly implicates defendant. But even assuming without deciding that such evidence is testimonial, admitting the evidence through Detective Blandford as one of several bases for his opinions rather than by the field officer who observed defendant in the company of suspected gang members was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].) We are convinced beyond a reasonable doubt that the jury would have concluded defendant was affiliated with the Sureno criminal street gang even without Detective Blandford's testimony that defendant had been found in the presence of Sureno gang members on one or two occasions.

34

Evidence was presented during trial that defendant had a tattoo of three dots on his wrist as well as a tattoo of the number 3 on his left pectoral muscle. The number 13 is associated with the Sureno gang. (*In re I.M.* (2005) 125 Cal.App.4th 1195, 1201 [expert explained the number 13 "is an identifier used by the Sureno street gang"].) Three dots as well as the numbers 1 and 3 can represent the number 13 in gang culture.

Although later denied at trial, defendant's mother told an investigator that defendant often wore blue and that she sometimes overheard conversations between defendant and friends in which the phrase "Sur Trece" was spoken. The color blue is associated with Surenos as is the phrase "Sur Trece," which was described as a Sureno "battle cry." (*In re I.M., supra,* 125 Cal.App.4th at p. 1201 [expert explained the color blue and the words trece or sur trece are Sureno identifiers].) Similarly, although defendant's stepfather denied doing so during trial, an officer testified that the stepfather told him he believed defendant was a Sureno gang member and that defendant's favorite number was 13, he always dressed in blue, and that he hated Nortenos.

During a random cell search conducted while defendant was incarcerated and awaiting trial in this matter, an officer found several drawings in his cell, one of which depicted a gun, liquor, cash and dice with the numbers one and three. Another depicted a hand with three dots on the fingers holding what appeared to be a joint. The drawing also depicted two clowns, one with three dots clustered around his right eye as well as the numbers 1 and 3 below his nose, and the other had the letter S nearby. Defendant was the only occupant of the cell. The drawing also included a woman's face with three dots and the number three.

This evidence was more than sufficient to establish defendant's Sureno gang ties even if one disregards Detective Blandford's testimony about defendant hanging out with Sureno gang members on occasion. Thus, even if the court erred in admitting the testimony about defendant being found with Surenos on one or two occasions, we are

convinced beyond a reasonable doubt the error was harmless.  And, the absence of other testimonial hearsay firmly negates defendant's confrontation clause objection.

VI

*Insufficient Evidence Supports the Gang Charges*

Defendant contends insufficient evidence supports defendant's convictions for the substantive gang offenses in counts 9 and 10.  Given our reversal on counts 9 and 10, we need not address defendant's substantial evidence challenge to the gang charges.

VII

*Admissibility of Defendant's Booking Statements Regarding Gang Membership*

Defendant contends the court violated his Fifth Amendment privilege against self-incrimination under *Miranda*, *supra*, 384 U.S. 436 [16 L.Ed.2d 694] by admitting several of his statements to jail classification officers that he was an active Sureno gang member.  Under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  (*Miranda, supra,* 384 U.S. at p. 444.)  An individual is subjected to "custodial interrogation" whenever law enforcement officers initiate questioning after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  (*Ibid.*)  The Supreme Court later clarified that the definition included not only express questioning by law enforcement but also its "functional equivalent."  (*Arizona v. Mauro* (1987) 481 U.S. 520, 526 [95 L.Ed.2d 458].)

In *Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297], the Supreme Court defined the phrase "functional equivalent" of express questioning to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating

36

response from the suspect." (fns. omitted.) Later, in *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601 [110 L.Ed.2d 528], the Supreme Court recognized a " 'routine booking question exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' " In that case, the court found the exception applied to questions asked regarding a defendant's name, address, height, weight, eye color, date of birth, and current age. (*Ibid.*)

The issue presented here is whether asking an individual about his gang affiliation for jail administrative purposes, particularly for the safety of custodial staff and inmates, comes within the purview of the booking exception to *Miranda*. Recently, in *People v. Elizalde* (2015) 61 Cal.4th 523, 527 (*Elizalde*), our Supreme Court held that it does not. Such questions exceed the scope of the exception because the questions are reasonably likely to elicit an incriminating response given California's criminal gang statutes and a defendant's pending charges. While officers are permitted to ask these questions for institutional security purposes, a defendant's un-Mirandized responses are inadmissible against him during the People's case-in-chief. (*Ibid.*)

The trial court thus erred by admitting defendant's responses to the jail classification questions about his gang membership in the absence of proper *Miranda* warnings. We find, however, that admission of the statements was not prejudicial. (See *Elizalde, supra,* 61 Cal.4th at p. 542 [erroneous admission of responses to jail booking questions harmless beyond a reasonable doubt where the defendant's gang membership was convincingly established by three witnesses who testified that they knew him to be a gang member and the gang expert opined that defendant was a gang member].) Here, the record contains convincing evidence of defendant's gang membership even without his jail classification admissions. As discussed more fully above, evidence of defendant's gang tattoos, his preference for blue clothing, his hatred of Nortenos, the drawings with gang symbols which were found in his single person cell while awaiting trial, and the fact that he admitted receiving a stolen vehicle from an Hispanic man with similar gang

tattoos, among other things, amply established his Sureno gang affiliation. In light of this evidence, admitting defendant's statements to the booking officers that he was an active Sureno gang member was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24; *Elizalde, supra,* 61 Cal.4th at p. 542 ["Because [defendant's] gang affiliation was amply established by independent and uncontradicted evidence, the erroneous admission of his challenged statements was harmless beyond a reasonable doubt."].)

VIII

*Discovery of Police Personnel Records*

Prior to trial, defendant filed a motion pursuant to Evidence Code sections 1043 through 1045 to discover citizen complaints against Officer Fautt for using excessive force or fabricating charges. The trial court found defendant had satisfied the relatively low good cause threshold on those two issues, and conducted an in camera hearing pursuant to Evidence Code section 1045, subdivision (b). The court concluded no material in Officer Fautt's personnel records was discoverable. Defendant requests that we review the in camera hearing to determine whether the trial court abused its discretion in so ruling.

Evidence Code sections 1043 through 1045 and Penal Code sections 832.5, 832.7, and 832.8 codify *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).) " 'The statutory scheme carefully balances two directly conflicting interests: the peace officer's just claim to confidentiality, and the criminal defendant's equally compelling interest in all information pertinent to the defense.' " (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

When a defendant seeks to discover an officer's personnel records, he or she must file a written motion describing the type of records or information sought and the materiality of such records to the pending litigation. (*Mooc, supra,* 26 Cal.4th at

p. 1226.)  If the trial court concludes the defendant has "made a showing of good cause, the custodian of records should bring to court all documents 'potentially relevant' to the defendant's motion." (*Ibid.*)  "The trial court 'shall examine the information in chambers' (Evid. Code, § 1045, subd. (b)), 'out of the presence and hearing of all persons except the person authorized [to possess the records] and such other persons [the custodian of records] is willing to have present' ([Evid. Code], § 915, subd. (b); see [Evid. Code], § 1045, subd. (b) [incorporating [Evid. Code], § 915])." (*Mooc*, at p. 1226.)  Thus, "both *Pitchess* and the statutory scheme codifying *Pitchess* require the intervention of a neutral trial judge, who examines the personnel records in camera, away from the eyes of either party, and orders disclosed to the defendant only those records that are found both relevant and otherwise in compliance with statutory limitations." (*Id.* at p. 1227.)

We augmented the record on our own motion with the sealed transcript of the in camera hearing as well as the unsealed portion of the hearing transcript regarding defendant's *Pitchess* motion.  The sealed transcript of the in camera hearing reads in full as follows:

"(The following proceedings were held in chambers, ORDERED SEALED.)

"THE COURT:  We're in chambers with the clerk, the reporter, the AG representative.  And for the Highway Patrol we have?

"MS. ABERCROMBIE:  Sergeant Kim Abercrombie.

"THE COURT:  And you have the records concerning the officer?

"MS. ABERCROMBIE:  Yes, I do.

"THE COURT:  And are there any relevant -- is there any relevant material?

"MS. HARLAN:  I do not believe that there is, here are two -- there were two complaints filed in 2007.  One has nothing to do at all -- one was a verbal discourtesy,

39

has nothing to do with tactics or anything of that nature.

"And there is one other complaint that was also in 2007, and it had to do with the conclusion of a pursuit and the individual was arrested, and they didn't feel that they should have been arrested for it.

"THE COURT: So there's no allegation of excessive force?

"MS. HARLAN: No, sir.

"THE COURT: And no allegations concerning credibility of the officer?

"MS. HARLAN: No, sir.

"THE COURT: Okay. Then there will be no material evidence to turn over. That will conclude the hearing, I'll order this portion of the transcript to be sealed pending further order of the Court."

Our review of the augmented record reveals that the representative of the custodian of records stated there were no complaints against Fautt for using excessive force or for fabricating charges. We cannot tell from the transcript, however, whether the trial court actually reviewed the documents brought by the custodian of records, and, if so, which documents the court reviewed. Under the circumstances, we shall remand the matter to the trial court for further proceedings. (*Mooc, supra,* 26 Cal.4th at p. 1231 [remand proper where a trial court has failed to make a record of the *Pitchess* documents it reviewed in camera].)

If the trial court actually reviewed Officer Fautt's personnel records rather than merely relying on the custodian of record's representations, we direct the trial court to hold a hearing to augment the record with the evidence it considered when ruling on defendant's motion. (*Mooc, supra,* 26 Cal.4th at p. 1231 [remanded with directions to hold a hearing to augment the record with the evidence the trial court considered in chambers when it ruled on the *Pitchess* motion].) A transcript of those proceedings as

40

well as copies of the documents reviewed shall be transmitted to this court for further review.

If, however, the trial court did not actually review the requested records during the in camera proceeding, we direct the trial court to do so in chambers upon remand. (See § 1260 [reviewing court "may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances"]; *People v. Gaines* (2009) 46 Cal.4th 172, 180 (*Gaines*).) If the trial court's inspection on remand reveals no relevant information, the judgment as modified by this opinion shall be reinstated. (*Gaines,* at pp. 178, 180.) If the in camera inspection reveals relevant information, the trial court must order disclosure and allow defendant an opportunity to demonstrate prejudice. (*Ibid.*) To establish prejudice, defendant must show "a reasonable probability of a different outcome had the evidence been disclosed." (*Id.* at p. 182.) If defendant makes the requisite showing of prejudice, the court shall order a new trial. Given our reversal of defendant's convictions for counts 9 and 10, such charges shall be stricken from the information in any retrial.

Defendant is not precluded from seeking appellate review of the trial court's rulings on the *Pitchess* motion following remand. (*Gaines, supra,* 46 Cal.4th at p. 181, fn. 3 [defendant retains the right to appeal from the judgment for the limited purpose of challenging the *Pitchess* findings].)

IX

*Cumulative Error*

Defendant contends that any errors, when combined, rendered his trial fundamentally unfair. Reversal, according to defendant, is therefore required.

" '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*Cunningham*, *supra*, 25 Cal.4th at p. 1009.) The few errors that may have occurred

during defendant's trial were harmless, and viewed cumulatively, did not significantly influence the fairness of defendant's trial. In other words, whether any purported errors are viewed individually or collectively defendant received a fair trial, although not a perfect one. But perfection is not required. (*Ibid.*)

DISPOSITION

Defendant's convictions for counts 9 and 10 are reversed. The matter is remanded for further proceedings concerning defendant's *Pitchess* motion as described above.


     HULL     , Acting P. J.


I concur:


     ROBIE     , J.

MURRAY, J. Concurring.

I concur with the majority. I write separately because the trial court's *Pitchess*[1] in camera "review" was inadequate for a number of reasons not discussed by the majority.

Discovery of information from a law enforcement officer's personnel file is statutory. (Evid. Code, §§ 1043-1047; Pen. Code, §§ 832.5, 832.7, 832.8.) "By providing that the trial court should conduct an in camera review [upon a showing of good cause], the Legislature balanced the accused's need for disclosure of relevant information with the law enforcement officer's legitimate expectation of privacy in his or her personnel records." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1220 (*Mooc*).) Trial courts are entrusted with achieving this balance.

In *Mooc*, our Supreme Court provided guidance to trial courts on *Pitchess* motions. The *Mooc* court noted that after the trial court makes a determination of good cause, "both *Pitchess* and the statutory scheme codifying *Pitchess* require the intervention of a neutral trial judge, who *examines* the personnel records in camera, away from the eyes of either party, and orders disclosed to the defendant only those records that are found both relevant and otherwise in compliance with statutory limitations." (*Mooc*, *supra*, 26 Cal.4th at p. 1227, italics added.) Other than the court personnel, only the custodian of records and a person the custodian is willing to have present may attend the in camera hearing. (Evid. Code, § 915; *Mooc*, at p. 1226.) All documents that are " 'potentially relevant' " must be produced by the custodian of those records "to permit the trial court to examine them for itself." (*Mooc*, at pp. 1228-1229.) The custodian must be placed under oath. Defendants are protected from an agency's failure to produce potentially relevant records "by the fact that a representative of the custodian of records is

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

1

placed under oath before responding to a trial court's questions during the in camera inspection of records." (*Id.* at p. 1229, fn. 4; see also *People v. White* (2011) 191 Cal.App.4th 1333, 1335 (*White*) ["In order to protect the defendant's right to a fair trial, the custodian must be placed under oath."].) "The trial court should [] make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review." (*Mooc*, at p. 1229.) Our high court suggested methods by which an adequate record can be made: (1) copies of the records could be sealed in a confidential folder in the trial court's file**[2]**; (2) a list of the documents the court considered could be prepared and made part of the court record; or (3) the trial court could simply identify on the record the documents it examined.**[3]** (*Ibid.*)

Based on *Mooc*, the Court of Appeal for the Second Appellate District, Division Six, held that "where the custodian of records does not produce the entire personnel file for the court's review, he or she must establish on the record what documents or category of documents were included in the complete personnel file. In addition, if it is not readily apparent from the nature of the documents that they are nonresponsive or irrelevant to the discovery request, the custodian must explain his or her decision to withhold them. Absent this information, the court cannot adequately assess the completeness of the custodian's review of the personnel files, nor can it establish the legitimacy of the

---

**[2]** The Supreme Court said, "[i]f the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file." (*Mooc*, at p. 1229.) As an alternative to busy trial courts photocopying the records, the trial court can preserve the record by ordering the agency custodian to present copies for sealing if the custodian has not done so.

**[3]** The latter two options can assist in the augmentation of the record on appeal because both options identify the documents that could later be produced in the trial court and then transmitted to a court of review. However, after five years, these options may be ineffectual if the records have been destroyed pursuant to Penal Code section 832.5, subdivision (b), which provides that citizen complaints of officer misconduct need only be retained by the agency for five years.

custodian's decision to withhold documents contained therein. Such a procedure is necessary to satisfy the Supreme Court's pronouncement that 'the locus of decisionmaking' at a *Pitchess* hearing 'is to be the trial court, not the prosecution or the custodian of records.' (*People v. Mooc*, *supra*, 26 Cal.4th at p. 1229.) It is for the court to make not only the final evaluation but also a record that can be reviewed on appeal." (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69 (*Guevara*); see also *Sisson v Superior Court* (2013) 216 Cal.App.4th 24, 39 (*Sisson*) [the trial court's effort to inquire into what types of documents the custodians opted not to produce "fell short of requiring the custodians to establish on the record what documents or category of documents were included in the officers' complete personnel files and, where applicable, to explain their decisions to withhold certain documents"]; *People v. Wycoff* (2008) 164 Cal.App.4th 410, 415 (*Wycoff*) [conditional reversal and remand for a new *Pitchess* hearing ordered, in part, because the custodian did not provide a summary of the documents in the personnel file that were not presented for the court's review].)

Here, the record reflects the following shortcomings in the in camera hearing:

(1) The record does not show that the custodian(s) of records was ever placed under oath. (*Mooc*, *supra*, 26 Cal.4th at p. 1229, fn. 4.) This error, in and of itself, requires remand for a new *Pitchess* hearing. (*White*, *supra*, 191 Cal.App.4th at pp. 1335, 1340-1341.);

(2) The trial court did not ask the custodian of records whether she was, in fact, a custodian of records or representative thereof[4];

---

**4** In fact, it is not clear who was serving as the custodian of records or a representative of the custodian of records - California Highway Patrol (CHP) Sergeant Abercrombe, who produced two reports, Ms. Harlan, who was legal counsel for CHP, or both individuals. Neither testified that they were the custodian of records or a representative thereof. Unless otherwise indicated, I will use the term "custodian" to describe the custodian of records or the custodian's representative, whoever that may be here.

3

(3) The trial court did not ask the custodian of records whether she personally searched the officer's personnel file, so it could assure itself that potentially relevant records were not overlooked;

(4) The trial court did not expressly ask whether the documents the custodian produced were *potentially* relevant to the scope of the discovery for which good cause was shown – here, excessive force and credibility. Rather, the court asked for an opinion about whether the documents were relevant. Asking whether the documents are relevant is different from asking if they are *potentially* relevant;

(5) The trial court relied on representations of the legal representative for the agency when it asked specifically whether there were any allegations of excessive force or credibility of the officer, and there is no evidence the legal representative had searched the officer's personnel file, had any independent knowledge of whether the personnel file actually contained any such allegations, or even read the reports that were brought to court by the sergeant;

(6) The trial court did not inquire about the records or categories of records in the officer's personnel file the custodian(s) opted not to produce, and the record reflects nothing about those other records (*Sisson*, *supra*, 216 Cal.App.4th at p. 39; *Wycoff*, *supra*, 164 Cal.App.4th at p. 415; *Guevara*, *supra*, 148 Cal.App.4th at p. 69);

(7) The record does not reflect that the trial court ever reviewed the reports that the custodian produced, both of which *potentially* contained information that had a bearing on the credibility of the officer; and

(8) The trial court made no record whatsoever about the two reports the sergeant brought to the in camera hearing.

To be sure, our high court has made clear that "[d]ocuments *clearly irrelevant* to a defendant's *Pitchess* request need not be presented to the trial court for in camera review" by the custodian. (*Mooc*, *supra*, 26 Cal.4th at p. 1229, italics added.) However, "if the custodian has *any doubt* whether a particular document is relevant, he or she *should*

4

*present it* to the trial court." (*Ibid*., italics added.) The custodian's obligation is to produce those records that are "*potentially* responsive to defendant's specific request." (*Id*. at p. 1230, italics added.) The trial court cannot abdicate to a custodian its responsibility to examine the produced documents and then assess the discoverability of the information contained in them based *solely* on the representations of the custodian. (*Sisson*, *supra*, 216 Cal.App.4th at p. 39.) "To the contrary, it is the trial court's active involvement in the *Pitchess* process that allows the process to work as intended." (*Ibid*.)

Here, not only did the trial court apparently take the word of the legal representative, but that word was equivocal. The legal representative's initial response to the trial court's question as to whether there was "any relevant material," was prefaced with "I do not believe that there is . . . ." That response did not establish that the records were not " 'potentially relevant' " or that they were "clearly irrelevant." The legal representative of the agency then went on to provide evidence about the contents of the records. Receiving and considering this testimony would have been proper if the legal representative had been sworn (see *Mooc*, *supra*, 26 Cal.4th at p. 1229, fn. 4; *White*, *supra*, 191 Cal.App.4th at p. 1335), there was evidence she was a custodian of records or representative of the custodian of records, and that there was evidence indicating that prior to the hearing, she had actually reviewed the officer's complete personnel file, including the two reports that were produced at the in camera hearing by the sergeant.

In any event, the questions the trial court asked did not reveal all the information it needed. The trial court asked whether there had been "*allegations* concerning the credibility of the officer." But it is possible that there was evidence of dishonesty by the officer revealed in the investigation involving a "verbal discourtesy," even if there was no "allegation" concerning his credibility. The other investigation where the complainant asserted that he or she should not have been arrested raises questions about the officer's version of what occurred versus the complainant's side of the story. Like the "verbal discourtesy" investigation, the investigation involving that complaint could have

5

uncovered evidence that indicated the officer had been dishonest or his credibility was called into question, even if there was no "allegation" about the credibility of the officer.

Moreover, though the court was within its discretion to take such testimony from a custodian, it still had an obligation to examine the records and make its own independent determination. However, the record does not demonstrate that the trial court actually reviewed the records. Indeed, a reasonable reading of the record suggests that the trial did not.

As our high court suggested in *Mooc*, had the trial court here retained copies of the documents, we could independently review those documents and determine whether they contained any discoverable information. (*Mooc*, *supra*, 26 Cal.4th at p. 1228.) Unfortunately, the reports are not part of the record before us. Consequently, remand is required.

"*Pitchess* [citation] and its statutory progeny are based on the premise that evidence contained in a law enforcement officer's personnel file may be relevant to an accused's criminal defense and that to withhold such relevant evidence from the defendant would violate the accused's due process right to a fair trial. *Pitchess* and Evidence Code sections 1043 through 1047 also recognize that the officer in question has a strong privacy interest in his or her personnel records and that such records should not be disclosed unnecessarily." (*Mooc*, *supra*, 26 Cal.4th at p. 1227.) This balance cannot be achieved unless the trial court fulfills the duties outlined by the Legislature and our high court. The record does not reflect that the trial court did so here.

                                        _____MURRAY_____, J.

6